IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. |
| | 1:22-CR-426-SDG |
| vs. | |
| ORLANDO CLARK, | |
| Defendant. | |

## SENTENCING MEMORANDUM AND
## MOTION FOR DOWNWARD VARIANCE

**ORLANDO CLARK** ("Defendant"), through undersigned counsel, submits the following Sentencing Memorandum. Clark requests a downward variance based upon the information provided in the Final PSR and this Sentencing Memorandum.

### INTRODUCTION

On February 3, 2022, FBI agents visited Defendant at his home. Without retaining counsel or requesting any concession, Defendant invited the FBI agents to his dining room table, agreed for them to set up video equipment and, on three separate days (2/3/2022, 2/4/2022, and 3/31/2022) gave extensive statements on every aspect of his conduct. During this video sessions at his home, Clark answered every

question fully and completely, and gave a complete confession as to every crime he committed. Clark did not ask for any favors or consideration. He purposely did not seek assistance of counsel during the video sessions. Clark withheld nothing and offered to give further cooperation. Thereafter, the Government requested cooperation from Defendant, which he readily provided even though his cooperation did not qualify him for additional consideration under U.S.S.G. § 5K1.1.

Clark grew up in Detroit, Michigan. Despite a difficult childhood due to his parents' alcoholism and mental illness, Clark joined the military, lived a law abiding life, married, raised law abiding children, and has had a long career as a very talented steel fabricator. Clark's participation in the scheme for which he was convicted was due to his suggestibility and weakness. Clark had been law abiding throughout his life. But while he was in Afghanistan, Clark didn't think independently and got caught up in a scheme of "baksheesh" that is all too common in the Middle Ea st, but abhorrent to the laws and values of the United States.[1]

The "baksheesh" culture in Afghanistan to which Clark succumbed was described in an article titled "Bombs and Baksheesh," published by The Economist in 2010:

---

[1] Baksheesh, a Persian term, originally referred to tipping or charitable giving, but in its modern culture means political corruption and bribery characteristic of some cultures in the Middle East and South Asia.

The ubiquity of official corruption is laid bare in a rare UN report that seeks to quantify it. A survey conducted by the UN's Office on Drugs and Crime found that half of the 7,600 Afghans interviewed had paid a bribe in the previous year (see chart), handing over on average $160 each time, about a third of average annual GDP per head. This extrapolates to about $2.5 billion worth of baksheesh nationally every year: roughly as large as Afghanistan's opium economy, and a quarter of licit economic output.

https://www.economist.com/asia/2010/01/21/bombs-and-baksheesh

(last accessed April 7, 2023). The baksheesh culture is mentioned not to lessen his culpability, but to provide context to the circumstances in which Clark, a law abiding citizen throughout his life, committed these crimes. From the moment the FBI knocked on his door, Clark has never sought to excuse his crimes by asserting that "everyone did it." On the contrary, Clark's cooperation with law enforcement from the very beginning, his continued cooperation despite no possibility of a § 5K1.1 cooperation agreement, and his agreement not to interpose a statute of limitations or any other defense demonstrates that Clark's acceptance of responsibility is genuine, not mere lip service. This is story of greed, suggestibility, temptation, and weakness in a situation where there was significant government spending in a place where bribery is the norm.

## DISCUSSION

Well-established Supreme Court precedent requires district courts to perform four steps when sentencing a defendant: (1) calculate the sentencing range recommended by the advisory Guidelines; (2)

determine whether a sentence within that range, and within statutory limits, serves the factors set forth in 18 U.S.C.§ 3553(a), and, if it does not, select a sentence that does serve those factors; (3) implement any applicable mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence and, if applicable, explain why a sentence outside the advisory Guidelines range better serves the relevant sentencing purposes set forth in 18 U.S.C. § 3553(a).

## A. The Final PSR Correctly Calculates the Sentencing Guidelines

The total offense level of 25, though not binding on the Court, is correctly stated in the Final PSR.

The total offense level is the same offense level set out in the plea agreement. The Government and Clark agree on all aspects of the guideline calculation. Indeed, the Government joined and expanded Clark's objection to two enhancements contained in the Initial PSR. The Initial PSR included two substantial enhancements, one for "high level decision making" and the other for passport documents. The Government joined Clark's objection and provided additional statements. For example, the original PSR indicated that Clark was a high level decision maker because he had "authority to approve contracts." The Government disagreed with the enhancement for "high level decision making," as a matter of fact and law, stating, "The government is not aware of evidence that the Defendant had any

authority to approve contracts." (Final PSR, ¶ 59 Government Objection).

In addition, the Government joined and expanded on Clark's objection to Initial PSR's enhancement relating to passport documents. In its objection to this enhancement, the Government stated, "the two levels do not apply because the evidence relating to entry documents is unrelated to the 2012 procurement scheme on which Count 1 is based. These documents pertain to the 2015 visa fraud scheme (Count 2), which is governed by U.S.S.G. § 2L2.1." (Final PSR, ¶ 60 Government Objection).

Finally, the Government objected to the Initial PSR's statement that Criminal History Category II applied to Clark. The Government forthrightly stated:

> As reflected in the evidence discussed in the PSR, the offense in Count 1 was committed between 2012 and April 2013; moreover, the offense in Count 2 began in 2015. Because the 12 month sentence for the DUI was imposed in October 2013 and appears to have concluded in October 2014, Defendant would not have committed the instant offenses while serving his 12 month DUI sentence. As such, the two points under U.S.S.G. § 4A1.1(d) should not apply, and Defendant should remain in Criminal History Category I, lowering his range.

(Final PSR, ¶ 80 Government Objection).

By joining Clark's objections to the Initial PSR and pointing out legal and factual inaccuracies, the prosecutors in this case demonstrated

the highest level of professionalism and strict adherence to DOJ Principles of Federal Prosecution. *See* DOJ 9-27.720, cmt. 4(b) Principles of Federal Prosecution ("The attorney for the government should bring any significant inaccuracies or omissions to the Court's attention at the sentencing hearing, together with the correct or complete information. The attorney may also wish to highlight certain factual findings in making a sentencing recommendation to the court.")(available at https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.720)(last accessed on April 7, 2023).

**B. Whether a Guideline Sentence Serves the Factors Set Forth in 18 U.S.C.§ 3553(a), and, if it does not, select a sentence that does serve those factors**

In the second step of the sentencing process, "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The Court should consider, among other factors, (1) the nature of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to provide adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, and/or correctional treatment; (3) the

kinds of sentences available; and (4) the need to avoid unwarranted sentencing disparities among defendants.

### i. Nature of the Offense and History and Characteristics of the Defendant

In addition to crediting his cooperation with the government before and during this case, a sentence of time 18 months would also reflect Clark's positive history and characteristics.

Clark was born April 12, 1964, to the union of William Nathan Clark and Pauline Arnold. William Nathan Clark committed suicide in 1985 or 1986 after battling manic depression. Clark's mother is an alcoholic and is now sober. Clark's parents divorced when he was 5 years old. His father was a strict disciplinarian; his mother drank and partied. When he was with his mother, Clark consistently witnessed his mother drinking. His mother was verbally abusive would often leave him without adult supervision.

When Clark was 16 or 17 years old, he returned home from school one day and found his mother packing up the house. She told Clark *he* needed to figure out where to go, and she told him to contact his father. He decided to not contact his father and, instead, lived on the street for approximately three weeks. Clark moved back in with his father after his three weeks on the street. Though not known to Clark at the time, his father was suffering and had suffered from a life-long mental illness, i.e., manic depression.

Clark joined the United States Army shortly after high school graduation due to his self-described "rebelliousness" and as a way to get leave his father's home. Clark enlisted and served in the United States Army from 1984 until 1991. He was stationed at various locations to include Fort Campbell, Kentucky; Kaiserslautern in Germany; Fort Sill in Oklahoma; and the Persian Gulf during the Persian Gulf War. After he was discharged from the Army in 1991, Clark returned to Detroit and lived there until 2003.

Through introspection and hard work, Clark became a productive, responsible, law abiding citizen. He has been married to the same person for 38 years. In 1985, Clark married Helen Clark in 1985 in Clarksville, Tennessee. Helen Clark (neé: Klinger), is 61 and lives resides with the defendant and is employed in a responsible position at the Veterans Affairs Hospital. Ms. Clark is in good health and has never suffered from substance abuse or mental health problems.

Clark and his wife have raised two responsible, law abiding sons, Miles Clark, age 30, who lives in Douglasville, Georgia, and works with Clark in the family's steel fabrication business, and Julian Clark, age 26, who lives in Tampa, Florida, and is employed in IT. Clark has a close relationship with his children; he works with Miles daily and speaks daily with Julian.

Clark owns and operates Steel Concepts in Atlanta, Georgia. Steel Concepts performs exemplary work throughout the metropolitan area

in construction and renovation involving custom fabrication of steel for restaurants, lofts and other structures. Clark is well-respected in the construction industry. Below is an example of construction and steel fabrication for a recent client:



### ii. Seriousness of the Offense, Just Punishment, and Adequate Deterrence

Lengthy incarceration, though a specific deterrent, is not the only form of punishment to render a deterrent effect. The question at sentencing is what sentence will be an adequate deterrent to re-offending. Since his return from Afghanistan, Clark has been law abiding and has built a business based on quality work and financial integrity with his customers. Clark has not had any complaints from customers, much less any allegations of criminal misconduct.

Clark, a non-violent offender, will be 59 years old on the day he is sentenced. His age, personal history and circumstances are positive indicators that Clark will never re-offend. He has no felony history, no history of violence, and no prior history of incarceration. During the three days of video confessions, he expressed regret and shame to law enforcement. Throughout the process, Clark has expressed remorse, regret and shame to his customers (whom he informed of these proceedings), his family, friends, his pastor and members of his church.

### iii. Kinds of Sentences Available

Because the sentencing guidelines are not mandatory, this Court has broad discretion to fashion a sentence. Clark understands he will serve a term in prison and is not making an unrealistic argument that his sentence should be home confinement. On the other hand, a lengthy

period of confinement would be excessive and unjust. The Guideline range is but one factor and is "the starting point and initial benchmark . . .," not end of the sentencing process. *Gall*, 552 U.S. at 38. Id. at 30. The Government has indicated that Clark should be sentenced at the low end of the sentencing guideline and that it does not seek consecutive sentencing. The Government does not deny that Clark's cooperation was extensive, helpful, and comprehensive and was given without any realistic possibility of consideration under U.S.S.G. § 5K.1.1.

### iv. Need to Avoid Unwarranted Sentencing Disparities Among Defendants

The need to avoid unwarranted sentencing applies to this case. Todd Coleman, Clark's conspirator in this scheme, received a sentence of 33 months. Coleman's role enabled him to access information regarding contract bids. Coleman's role as an acquisition analyst involved, among other things, soliciting and evaluating bids, and recommending contract awards (Final PSR, ¶ 13). Here the Government has expressly acknowledged that Clark, unlike Coleman, had no ability to recommend contract awards. *See* (Final PSR, ¶ 59 Government Objection and Statement)("The government is not aware of evidence that the Defendant had any authority to approve contracts.")

Coleman had engaged in similar misconduct while in Iraq and it is clear that Coleman recruited and directed Clark throughout the scheme.

See e.g. (Final PSR, ¶ 28(iii)(" On March 20, 2012, Coleman *directed* Clark to send Samadi instructions to adjust Raj's Construction bid…)(emphasis added); (Final PSR, 43)("On March 21, 2012, Clark emailed Samadi and stated, "[T]odd said to put the information the same as it is on the spread sheet...Can you send this to [T]odd just like this with the culverts added…).

Clark does not assert that Coleman's role as the initiator of the scheme and direction of Clark during the scheme somehow absolves or lessens Clark's responsibility for the criminal conduct. Clark accepts and has long accepted that he is fully responsible for every dollar of the $400,000 attributable to this scheme. While Coleman's role does not diminish Clark's responsibility for these crimes, Coleman's sentence is relevant to statute's requirement to avoid unwarranted sentencing disparities.

Here, Coleman and Clark's scheme netted $400,000, which they divided equally. Assuming that Coleman and Clark were equally culpable regardless of their respective roles in the scheme, sentencing Clark to 57 months (the low end of the guidelines) while sentencing Coleman to 33 months would create an unwarranted disparity between co-conspirators who worked together to perpetuate this scheme. The counts regarding the visa fraud do not justify a disparity between 57 and 33 months as the visa fraud was far less in scope ($400,000 vs. $9,000) than the bribery scheme.

## CONCLUSION

A downward variance is appropriate in this case pursuant to the factors in 18 U.S.C. 3553(a), including, without limitation, Clark's history, personal characteristics, and nature and circumstances of the offense. This sentence reflects the seriousness of the offense, the need for specific deterrence, and the need to avoid unwarranted sentencing disparities. Clark respectfully requests that the Court grant a downward variance and impose a sentence of 18 months of incarceration.

7 April 2023.

By: **s/ Bruce S. Harvey**
Bruce S. Harvey
Ga. Bar No. 335175

**Law Office of Bruce S. Harvey**
146 Nassau Street
Atlanta, Georgia 30303-2010
Telephone: (404) 659-4628
Email: bruce@bharveylawfirm.com

By: **s/ Stephen M. Katz**
Stephen M. Katz
Ga. Bar No. 409065

**THE KATZ LAW FIRM – GA. LLC**
1225 Johnson-Ferry Road
Building 100  –  Suite 125
Marietta, Georgia 30068-5407
Telephone: 770.988.8181
Email: smkatz@katz.legal